Marston, J.:
Complainants in 1873 were and had been engaged in the busines.s of getting out logs and timber, and in running the same down the Au Sable river into a general boom. The timber was used in rafting the logs at this boom, from *whence they were towed to East Tawas and there manufactured at their mill into lumber. The timber used in rafting the logs was put into their boom at East Tawas, and there sold to parties dealing therein, as complainants, except for the purpose of rafting their logs as stated, did not get out or deal in timber.
Complainants resided in the city of New York, and while engaged in this business they became indebted to various parties, and among others to the Merchants’ and 'Manufacturers’ Bank, during the year of 1873, in the sum of about eighteen thousand dollars, which was represented by past due drafts and acceptances held by the bank.
The bank, during the fall of that year, had been making efforts to collect or secure this indebtedness. Letters had been written by the bank to complainants, and Mr. Hinchman, president of the bank, when in New York on business, had called upon complainants, at which time terms of settlement were *488 discussed and partly agreed upon. Afterwards, at a meeting of the directors of the bank, this agreement was submitted to them, and, with certain changes then proposed and made, was approved of, and Mr. Hinchman, the president, and Stanley G. Wight, a stockholder and director, were authorized to visit New York and secure the execution of an instrument as approved by the directors and drafted by .one of the officers of the bank on its behalf. Accordingly these gentlemen visited New York, and upon their arrival had an interview on the evening of December 29th with William G. Grant, Jr. On the next day they called upon complainants, when the agreement, as proposed by the bank, was executed. Previous to this time, viz.-: December 23d, an involuntary petition in bankruptcy was filed against complainants in New York city, and service bad been made upon them on December 28th. Hinchman and Wight were informed of these proceedings, and the agreement then entered into was dated December 24th on account thereof, the parties by mistake supposing that would be *prior to the commencement of the proceedings in bankruptcy, and also because the 24th was the date of the previous interview between Hinchman and complainants. All parties agree that the understanding, both before and at the time this agreement was entered into, was to pay the hank the full amount of its claim; that on account of complainants’ pecuniary circumstances, which were well known, payment should be made by a sale of certain logs and timber, and immediate possession thereof given, subject only to be defeated by complainants’ creditors.
At this time complainant had a large quantity of-logs and timber in the Au Sable boom, and also a quantity of timber, supposed and represented to be over one million feet, in their mill-boom at East Tawas. Such were the existing circumstances at the time the agreement was entered into as already stated. A copy of this agreement is given in the margin. †
*489 *At the time this agreement was executed, complainants agreed to write their agent at East Tawas, J. S. Kloppenburg, informing him of the agreement, and instructing him to cany it out; which they did on the 6th day of January, 1874, as follows:
“Stanley G. Wight, trustee for M. & M. B’k, Detroit:
Dear Sir: — Mr. J. S. Kloppenburg is hereby authorized to carry out the terms of the contract between us and the M. & M. B’k of Detroit, dated December 24th, 1873, *and to execute and deliver over to you all the necessary papers proper in the matter, and to put you in full possession of the logs and long timber mentioned in the contract, and to act in every respect as our attorney in the matter.
“Yours, etc.,
“(Signed) We G. Grant & Son.”
Upon the 20th day of January, 1874, Messrs. Hinchman and Wight left Detroit for Tawas, and arrived there on the 21st or 22d. They met Kloppenburg, who informed them that an *490 attachment suit had been commenced against complainants, and that the sheriff was then ready to attach property. He, Kloppenburg, showed them the timber in the boom, but it being imbedded in ice and covered with snow, they could not examine it, but were assured by him the proper quantity was there. After thus looking at the timber in the boom, they repaired to the office, when Kloppenburg made out and delivered to Wight, a bill of sale of the logs and timber, antedated December 24th, 1873, viz.:
“Mr. Stanley G. Wight, Trustee, bought of Iosco Mills, Manufacturers of Gang and Sawed Lumber—
“Dec. 24, 1873.
“To One million feet of long timber now in our boom,
at $10.50 per M.,.....$10,500
“ One and one-half million feet short logs, marked W. G. G., in the Au Sable River, . . 12,000
$22,500”
*491 Afterwards, and on the 6th day of February, 1874, an order upon the Au Sable Boom Company, accepted conditionally by the company, was delivered to Wight, as follows:
“February 6, 1874.
“Au Sable Boom Co., Au Sable, Mich.:
“Please deliver to Stanley G. Wight, Trustee, or order, fifteen hundred thousand (1,500,000) feet from our short logs, marked W. G. G., etc., and oblige,
“Tours truly,
“(Signed) Julius Kloppenburg.”
*Endorsed: “Accepted, provided a sufficient numher of logs are in the river. (Signed) A. F. Gat, Treasurer Au Sable River Boom Co.”
The delivery of this order was delayed on account of a difficulty between the boom company and complainants about an unpaid account.
As early in the season of 1874 as the ice and weather would permit, complainants, by their agents, commenced rafting the timber in their mill boom. Some time in June, about the middle, they discovered that there would not be white pine enough in the boom to make up the contract quantity, and some white-pine was received after this from the Au Sable boom and added to the raft, but not enough to complete it. The raft as made up was scaled, and on the 4th of July a tug took it in charge, which had been sent there for that purpose by Wight, and started with it for Detroit. The scale bill showed four hundred and ninty-three thousand four hundred and seventeen feet of white pine and two hundred and thirty-three thousand eight hundred and forty-six feet of Norway in the raft. There is a dispute between the parties as to Wight’s knowledge of the contents of the raft before the tug started with it, and of an offer on the part of complainants to take out the excess of Norway pine over two hundred thousand feet, and of their ability and willingness to supply during the season, and attach to some other raft going to Detroit, enough white pine to make up the contract quantity. This will be noticed further on.
Early in the season of 1874 the logs were rafted by the boom company, and complainants’ agents at East Tawas notified by *492 telegram of the fact, when he, according to a rule of the boom company, which required all rafts to be removed within twenty-four hours after notice of their completion, sent a tug, chartered by complainants by the season at so much per thousand, and had the logs towed to their boom at East Tawas. These logs were sawed at Complainants’ mill and delivered on the rail of vessels as agreed upon in the contract; the expense of towing these logs from the Au Sable to East Tawas was paid by complainants, and by them charged to the trustee. This charge is one of the disputed items. This statement, with what we specifically refer to as we proceed, is sufficient to afford an understanding of the questions raised and discussed.
Complainants file their bill for an accounting, claiming a balance due them of seven thousand five hundred dollars and upwards, and also asking that the drafts and acceptances held by defendants be canceled and delivered up to them. It is not necessary to set forth a full abstract of defendants’ answer. They admit the execution of the agreement, but allege that it was but a preliminary agreement, a mere memorandum or basis of a parol agreement between the parties, which remained in full force; they deny any indebtedness to complainants, and claim a balance due the bank of about sixteen hundred dollars.
A decree was rendered in favor of complainants, in which the court specified and charged complainants with the original indebtedness and interest thereon, with cash paid complainants since the date of the contract, and with certain expenditures made by the trustee in the execution of the trust, with interest thereon from July, 1874. It then credits complainants with the contract price of the timber delivered, less thirty-three thousand eight hundred and forty-six feet considered as the excess of Norway in the raft, with the contract price for the logs at eight dollars per thousand, with the difference between the price paid for the logs and the contract price of the lumber, for sawing, with interest thereon from July 21, 1874; and strikes a balance, resulting in a decree in favor of complainants for four thousand five hundred and sixty-three dollars and eighty-eight cents, from which defendants appealed.
*493 A preliminary question was raised here on the argument, viz.: that only the items mentioned in the decree, in so *far as they injuriously affect defendants, can be reviewed or considered in this court, as defendants only appealed. It is further claimed that in case we are of opinion the court improperly charged one or more items against defendants, we must deduct such items from the balance found against-them, and cannot consider other items not charged against them, even although we may be of opinion they should be so considered, and which if now considered the result arrived at by the court below would still be correct. We cannot assent to this doctrine. The items mentioned in the decree may be considered as showing the method adopted by the court below in arriving at the result reached, and in a case like the present there is no objection to the adoption of this course. When, however, the case is appealed, no matter by which party, this court is not concluded by the court below in its statement of the account. The case when appealed brings up the entire record as a whole, and must be considered by this court upon all the facts, for the purpose of determining whether the final result arrived at is correct. And if correct, or if it is as favorable or more favorable to the appellant than all the facts will warrant, then we can but affirm the decree, even although we may adopt an entirely different course of reasoning or method in arriving at the same conclusion, or even be satisfied that the court erred in the allowance or rejection of some particular item or items to the appellants’ prejudice; any conclusion other than this would enable the court below, by the form adopted in drafting its decree, to compel both parties to appeal or to confine this court on appeal to an examination of but a part of the case upon the facts.
We are satisfied that the written contract must be held to include the entire agreement between the parties. The rights of the parties must be ascertained from a construction of that instrument, in the light of the circumstances existing, and known to both parties at the time it was entered into, and we must endeavor to carry out the *evident intent of both parties in making it, so far as the language *494 •of the contract and the rules of law applicable thereto will permit.
The principal object which defendants had in view was the collection of the debt due the bank. Complainants were in embarrassed circumstances; proceedings in bankruptcy were not only feared, but had actually been commenced against them. Under this state of things, it is very evident that nothing short of an absolute sale and change of possession of sufficient property to satisfy this debt would accomplish what, defendants desired. True, any sale then made might be defeated by the bankruptcy proceedings, or by the creditors of complainants, but subject to these contingencies, and in order to guard against and to prevent so far as possible any interference by complainants’ creditors, the parties evidently intended to make an absolute sale and transfer of the property. With this object in view, the written agreement was entered into. It provided that complainants were to convey to Wight, in trust for the bank, one million feet of merchantable long timber, not to exceed twenty per cent, of Norway, in the boom at East Tawas, and enough more to make up the quantity, at ten dollars and fifty cents per thousand feet, the sale and delivery in the boom to be made as soon as possible. They also agreed to make and deliver to the trustee an order on the Au Sable boom company, to be accepted by them, for one million and a half of good merchantable white pine logs at eight dollars per thousand, the same to be the property of said S. Gr. Wight, in trust for the Merchants’ and Manufacturers’ Bank. The bank, in return for the sale and delivery to Wight, in trust, of said logs and timber, agreed to place complainants’ acceptances in Wight’s hands, to be canceled and delivered as soon as the title should be perfected and become the lawful property of said Wight, and they agreed that in case of failure to carry out the agreement, by reason of action being taken by other creditors so *that the property “ hereby transferred ” shall not be held legally by said trustee, then the agreement is to be void, etc.
All this contemplated an immediate change of title, so soon as the trustee could obtain a formal conveyance and delivery *495 •of the timber in the boom and an accepted order for the logs. “ The sale and delivery of the timber in the boom to be made as soon as possible,” did not refer to a sale and delivery after the timber would be rafted, as this might, on account of the proceedings of other creditors, even if the bankruptcy proceedings were discontinued, defeat the evident intention and object in view. No matter what representations complainants may have made as to the actual quantity of timber in the boom, it was not relied upon, because the parties, in contracting for a certain quantity, made provision, after what was in the boom had been exhausted, that enough more should be obtained from some other source to make up the one million feet. In the light of this fact, the clause as to the sale and delivery of the timber in the boom, to be made as soon as possible, is significant. It shows the intention to be, that the title to whatever was in the boom, not exceeding the contract quantity, should pass as soon as possible, and not await the rafting, and possibly the arrival of timber from some other point, to make up the desired quantity. The title to whatever was in the boom should, so far as the parties could, be placed out of the reach of creditors. As to the shortage, if any, they were willing to run all risk. This clause was undoubtedly added in view of the well known fact that none of the timber could be rafted until after the ice had disappeared in the following spring, and could not perhaps be completed until timber had been received from some other point, and they were not willing to run the risk of waiting so long before passing the title.
In reference to the logs, they agreed to deliver an order on the boom company. This, when accepted, would remove the logs from all further control of complainants, and would *bind the boom company to deliver them to the trustee, and the parties must have so understood it. Upon the delivery of this order, the logs “ were to be the property -of said Stanley G-. Wight.” And in return for sale and delivery to Wight, in trust, of said logs and timber, the notes and acceptances were to be placed in his hands to be cancelled and delivered to complainants, “as soon as title to said logs and timber is perfected, and becomes the lawful property of said *496 S. G. Wight, trustee.” This last clause undoubtedly was put in to guard against any difficulty that might arise with other creditors, or grow out of the bankruptcy proceedings, likely to defeat the trustee’s title. The contract also provided that Wight should employ complainants to cut these logs into lumber, but they were in such case to be cut into such lumber as he, Wight, should direct, and he also had authority in certain events, “ to employ any one else to cut said logs, or sell them in the log, as may suit him best.” All this is inconsistent with any ownership in complainants, but is consistent with title in the trustee. The provision' in regard to the price to be credited complainants in case they sawed the logs, upon the basis of the lumber cut therefrom, is not inconsistent with the view we have taken. The very fact that a definite price then agreed upon was to be credited, less the price paid for the logs while in the boom, and not the market price at the time the lumber should be sold, clearly shows that the complainants were no longer considered the owners of the logs.
It was but a method adopted of giving them certain advantages growing out of the sawing of them, and of fixing a saw bill, notwithstanding the fact that they had parted with the title, as it was evidently considered dangerous to permit the title to remain in them until the logs should be sawed.
The subsequent acts of the parties tend clearly in the same direction, and show such to have been their construction at the time the trustee went to Tawas and received a ^formal bill of sale of the logs and timber, and a delivery of the timber in the boom. But on account of an unsettled difficulty between complainants and the boom company, and in consequence thereof their refusal to accept, the order upon the company was not delivered until February. We have no doubt from an examination of the entire agreement, in the light of the then existing and well known facts, but that the title to the timber in the boom, so far as covered by the contract, passed upon receipt of the bill of sale in January, and that the title to the logs passed upon receipt of the order of complainants upon the boom company, accepted by *497 the company. — Lingham v. Eggleston, 27 Mich., 328, and cases there cited.
.This conclusion settles the question as to whom the amount paid for towing the logs from the Au Sable boom to the mill should be charged. In the absence of custom, or any thing to the contrary in the contract, the amount should be charged to the owner of the logs. Such also is the fair construction of the contract. It provides that the timber shall be rafted and delivered to the trustee free from charges, so that in case it became necessary to tow timber from the Au Sable to complete the raft, the expense of such towing must have been borne by complainants. There is no clause, however, requiring complainants to be at any expense whatever in reference to the logs. They are delivered in the Au Sable boom by an accepted order, and it clearly was not the' intention that in case the trustee concluded to have them sawed, either at complainants’ mill or some more distant point, that they should be at the expense of towing them to such place of manufacture.
The next question is in reference to the quantity of Norway contained in the raft. Complainants insist that they had a right to put into that raft two hundred thousand feet of Norway and all the merchantable white pine then in the boom, not exceeding in all one million feet, and in case there was not sufficient white pine in the boom, then that *they had a reasonable time in which to deliver the balance, and they also claim that Wight accepted the raft, knowing the quantity of Norway then in it, and thus made it his own. This, defendants deny, and insist that not to exceed twenty per cent, of the quantity contained in the raft should have been Norway, and that all over this was at the risk and expense of complainants, and so understood at the time.
The contract is clear that it is only in case one million feet of timber is not in the boom that other is to be added. In taking what was in the boom, complainants had an undoubted right to put in two hundred thousand feet of Norway, and to complete the contract quantity of white pine from some other source, and they had a reasonable time in which to thus complete it.
*498 What would he considered a reasonable time, must be gathered from the contract and the known situation of the property. It was well known that in ease of a deficiency complainants would have to resort to the Au Sable boom for the shortage. The method of getting out and running logs and timber down the Au Sable river was also well understood. That the timber would be mixed up with the logs in the boom, which extended up the river some thirteen miles, and contained large quantities of logs and timber, the property of other parties, all well knew, ■and that by no reasonable means could complainants’ timber be separated and got out, except in the usual way of rafting, which would require considerable time. Complainants, we think, were therefore entitled to whatever time would have been required, in the usual .and customary manner of rafting by the boom company, to obtain and make up the one million feet according to the contract, where it appeared, as we are satisfied it did in this case, that they did have a sufficient quantity there. They had no right, however, to put into the raft to exceed two hundred thousand feet of Norway, and we are not satisfied that Mr. Wight ever agreed to or did accept the excess. It follows therefore that all over two hundred *thousand feet of Norway yet remains the property of complainants.
The next most important question relates to the charges made by the trustee in executing the trust; as to whether any part thereof, and if so how. much, could properly be charged to complainants.
This also must be determined from the contract. The intension, as already adverted to, could not well have been carried out had Mr. Wight been acting as the agent of both parties. The object was to pass the title and possession to some person in trust for the bank in such manner as to place it beyond the reach of complainants’ creditors. The contract in its several parts shows that Wight was not the trustee of complainants. If the title passed, as already stated, the duty of paying all expenses thereafter connected therewith would fall upon him as owner, unless a contrary intention could be gathered from the agreement. Complainants were to raft and deliver the *499 timber to the trustee, free from charges, when required. If defendants’ view is correct, there was no object in inserting this clause, as, without it, the trustee could have had it rafted, and charged the expense to them. There can be no question about the agreement. Mr. Hinehman, who had a previous interview with complainants about a settlement, drafted an agreement, which was submitted to the bank for approval, and certain changes were made therein. Hinehman in his testimony-says, when questioned as to what was said between the parties about the expenses of carrying out the agreement: “Absolutely nothing was said about the expenses of the trustee, but my understanding was, that the trustee was their agent and not ours, because in the paper that I drew up, I wrote in, Mr. S. G. Wight, trustee for them, but Mr. Hayes (vice-president of the bank, who drafted this agreement), I believe, left it out of his.” In the letter of January 6th, from complainants, directing their agent to carry out the contract, it is addressed to “ Stanley G. Wight, *trustee for M. &M. Bk., Detroit.” And the' first intimation of any thing to the contrary which we have been able to discover, is in the statement furnished by Wight to Kloppenburg, some time in September, 1874, in which he calls himself joint trustee for the bank and complainants. This statement was repudiated by Kloppenburg, and never assented to by him or complainants.
We are of opinion that Mr. Wight was trustee of the bank alone, and that the only expenses which could properly be charged to complainants, were those provided for in the agreement, or which, according to custom, in the rafting and delivery of logs or timber, and in the scaling and inspection of logs, timber or lumber and the sawing of logs into • lumber, would properly be chargeable to complainants, without reference to the ’trusteeship.
Other questions were discussed upon the argument, but enough has been said already, from which it is apparent that the decree of the court below was even more favorable to the defendants than the above views would warrant. We need not, therefore, consider the other questions in the case.
The decree must be afSrmed, with costs.
The other justices concurred.

 William G. Grant & Son to convey to Stanley G. Wight, in trust for the Merchants’ and Manufacturers’ Bank, all the merchantable long timber, not to exceed twenty per cent, of Norway, in the boom at East Tawas, and enough more to make up the quantity to one million of feet, at ten and a half dollars (810.50-100) per thousand feet; the same to be rafted and delivered *489 to said trustee, free of charges, when required, he furnishing the necessary chains for rafting the same. The sale and delivery in the boom to be made as soon as possible.
William G. Grant & Son will also make and deliver to S. G. Wight, trustee, an order on the Au Sable Boom Co., to be accepted by them, for one million five hundred thousand feet of good merchantable white pine logs, at eight dollars ($8.00) per thousand, the same to be the property of said S. G. Wight, in trust for the Merchants’ and Manufacturers’ Bank.
On the part of said Merchants’ and Manufacturers’ Bank, in return for sale and delivery to S. G. Wight, in trust, of said logs and timber, they are to place in the hands of S. G. Wight the notes or acceptances of said W. G. Grant & Son, amounting to eighteen thousand dollars and interest, the same to be cancelled and delivered to W. G. Grant & Son, as soon as the title to said logs and timber is perfected, and become the lawful property of said S. G. Wight, trustee.
The Merchants’ and Manufacturers’ Bank further agree that said S. G. Wight shall employ said Grant & Son to cut the one and a half million feet of logs into such lumber as he may direct, providing it can be done by them without unusual delay, such as might be caused by any accident, breakage of the mill, by fire, or by stoppage of the mill, or by its changing hands, or in any way by which the said Grant & Son could not perform the work with reasonable dispatch; in such an event the said S. G. Wight, trustee, may employ any one else tq cut said logs, or sell them in the log, as may suit him best.
But should Grant & Son cut said logs in lumber as contemplated, then they shall receive credit at the rate of six dollars ($6.00), twelve dollars ($12.00) and thirty-five dollars ($35.00) per thousand feet, according to quality of the lumber cut from said logs and delivered on the rail of vessel *490 for transportation, less eight dollars per thousand feet for the value paid for said logs while in the boom.
The money to be paid from time to time on the delivery of said lumber to S. G. Wight, trustee, free from any legal restraint, or from any jeopardy from creditors, or from any bankruptcy proceedings, by which he may be restrained from paying the said Grant & Son for cutting said logs into lumber, or pay the amount to said Michigan creditors of Grant & Son as may have furnished them with supplies, purchased in the fall of 1873, as directed by said Grant & Son or their agent, provided such payments shall not exceed the amounts due them for cutting said logs into lumber, as stated, and any balance that may be due them on this agreement.
In case of failure to carry out this agreement, by reason of action being taken by other creditors, so that the property hereby transferred shall not be legally held by such trustee, then this agreement shall be null and void, and their notes or acceptances shall be in full force and effect, and payable at once, the same as they are now.
In witness of the above agreement, the said parties have hereunto affixed their signatures to two copies of the above agreement.
24th December, 1873.
(Signed) WM. G. GRANT & SON.
T. H. HINCHMAN,
President Merchants’ and Manufacturers’ Panic, Detroit.
I, Stanley G. Wight, being the person mentioned in the foregoing agreement between Wm. G. Grant & Son, of New York, and the Merchants’ and Manufacturers’ Bank of Detroit, do hereby accept the trusteeship mentioned, and agree to carry out the agreement as set forth between the parties.
(Signed) STANLEY G. WIGHT.