The Regents of the University of Michigan v. Preston
B. Rose, Silas H. Douglas, Rice A. Beal et al.

Silas H. Douglas v. The Regents.

*Accounting for deficit in public moneys—Agency—Forgery—Allowance of
expenditures by public officers—Interest on public accounts—
Acquiescence in decree—Printing record.*

Books and similar exhibits need not be reproduced in the printed record
of a case.

The Supreme Court declined to allow a chancery cause to go to hearing
without printing the entire record, there being no appearance by
counsel on one side with whom to agree, subject to the court's
approval, as to how much ought to be printed.

Where a party to an accounting appeals from the decree, claiming that
there is an error against him in an amount which he has himself pre-
viously reported as due to the other party, he has the burden of
showing the error.

Where money had been paid out by an officer of the University of Mich-
igan for the benefit of the University in cases in which the Regents
could have expressly authorized its expenditure, it was *held* that they
might ratify the act and direct repayment with interest at any rate
not exceeding ten per cent., and that where they had made such pay-
ment with full knowledge of the facts, their action was final and
could not be disturbed. And where there was no fraud or conceal-
ment in the presentation to them of the account for interest, it must
be conclusively presumed that they acted with full knowledge, as it
was their duty to do. But the allowance of interest would not
imply a contract to allow it thereafter.

Interest cannot exceed seven per cent. in Michigan unless there is a writ-
ten agreement for a higher rate.

The Regents of the University of Michigan appointed a person to assist
the director of the chemical laboratory in receiving and keeping
account of moneys paid in to that department, and they paid said
assistant from the University funds, which embraced, with other
resources, the income of the laboratory. *Held,* that even though the
director may have had power to appoint and discharge the assistant,
yet if it was not made a part of his duty to keep strict watch and
save the University from loss through him, he could not be held
accountable for moneys received by him and not paid over, as the
assistant was not his agent but was in the employ of the University
and answerable to the Regents.

A bill for an accounting, brought by the Regents of the University of Michigan against the director of the chemical laboratory and his assistant whose duty it was to pay over to the director the money which he received, though both were responsible to complainant, charged them with a deficit in their accounts, and it was stipulated that each was to be held accountable for so much money as came into his own hands. The stipulation fixed, also, the amount of the entire deficit. *Held*, that proof that the assistant had received money would not alone establish liability against his superior, as it would not tend to show that the superior had received the money from the subordinate ; and the burden of proving that he had received it was upon the complainant, and, as between the defendants, it was on the subordinate.

On a bill for an accounting for a deficit the rules applicable to proof in civil cases must be observed, and the receipt of the money by the defendant may be shown by any competent testimony fairly tending to prove it, either alone or in connection with other circumstances.

Whether books carelessly kept by assistants who are not agents are admissible in evidence upon a bill for an accounting against their superior—*Q*.

In a suit for an accounting, defendant was charged with the receipt of money as shown by his signature upon the stubs in certain stub-books. He testified that the signature was not in his handwriting. *Held*, that this put the stubs in issue as would an affidavit denying the execution of an instrument sued on.

The acts, conduct and utterances of an accused party, if of the *res gestæ*, are competent evidence in a civil case as bearing on his culpability.

The Regents of the University of Michigan filed a bill against the director of the chemical laboratory and his assistant, an officer appointed by their authority. for an accounting for moneys received in that department and in which there was a deficit. The suit involved the question, as between the defendants, of the genuineness of the initial of the director, used in certain stub-books as a voucher to indicate that the assistant had accounted to him for moneys received. The director claimed that these initials were forged. So *held*, on appeal, upon comparison of the handwriting of both defendants, and especially of the director, which had changed somewhat, with that of the disputed vouchers ; and in the light, also, of expert testimony and, particularly, of the conduct of the assistant in admitting delinquencies in his accounts of moneys received, when the deficit was first called to his attention, and in borrowing money and mortgaging his property to make them good, and giving security to meet whatever deficits might be discovered.

An effort to make a suspected person acknowledge a wrong already committed is not wrong if undue means, fraud, illegal compulsion or duress are not used.

Where a defendant in a suit for an accounting denies the genuineness of part of the vouchers produced against him, but does not designate those which are spurious though he has an opportunity to do so, they must all be regarded as *prima facie* valid in the absence of other evidence that they are not so.

Where a party to an accounting acquiesces in the disallowance of any of his claims and does not complain of it in the appellate court, it may be assumed that he is satisfied with the decree upon them and does not desire to have it reviewed. But the court will also assume that every claim made by the appellant is in issue, and will examine all the evidence for anything that will tend to show whether it ought to be allowed.

Appeal from Washtenaw. Submitted October 12 and 13, 1880. Decided January 19, 1881.

Motion for leave to proceed without printing the record. Submitted January 6, 1880. Denied January 8, 1880.

*S. T. Douglass* and *Ashley Pond* for the motion.

*Byron M. Cutcheon*, a Regent, as *amicus curiæ*.

MARSTON, C. J. A motion has been made by the appellants to dispense with the printing of the record, or a part thereof, in this case.

From statements of counsel, and a showing made, it appears that books and other similar exhibits constitute a considerable part of the record. Such exhibits we never require to be printed. How much of the other evidence should be, can only be determined on examination, or perhaps by counsel, subject to approval by this court.

It appears, from the statement of Mr. Cutcheon, that the Regents have at this time no authorized counsel to represent them, and the case is of such importance that it should not be heard at the present term under such circumstances. The case, therefore, must stand continued for the term.

Perhaps, when there is counsel on both sides, we may consent to take up the case with the understanding that we shall then order the printing of whatever testimony either party deems important.

In any event, there is a considerable portion of the record that should be printed before a hearing is entered upon.

———

Motion for leave to be heard before printing the record. Submitted April 20, 1880.    Denied April 30, 1880.

*S. T. Douglass* for the motion.

MARSTON, C. J.    In these cases, owing to the extraordinary and unprecedented course adopted by the complainant in the original cause, declining to render that aid and assistance which the researches and argument of counsel would give, and which has been universally recognized as proper and necessary in courts, especially those of last resort, we find the request to dispense with the printing of the record an embarrassing one.    We do not know what questions are to be presented on the hearing, or the extent of the investigation that will be found necessary in the determination thereof.

We cannot, therefore, now say that the record should not be printed in the usual manner.    That this may result in heavy and unnecessary expense upon the losing party, much of which might be avoided could we have the customary assistance of counsel, is very probable.    It is, however, one of the consequences which we cannot avoid, when the case is thus thrown upon us, with no information on one side whether the full printing of the record is or not necessary. We must, as at present advised, assume that such printing is necessary, and act accordingly.

———

ACCOUNTING.    Bill and cross-bill.    Appeal taken by Douglass one, of the defendants in the original bill and complainant in the cross bill.    Decree modified in appellant's favor.

*Samuel T. Douglass, Ashley Pond* and *E. D. Kinne* for appellant. Courts may use such methods in detecting forgery as are capable of being used by all persons of ordinary intelligence, though not experts in handwriting: *Moore v. United States* 91 U. S. 270; as to examination of writing of disputed genuineness, see "The Handwritings of Junius Professionally Investigated" and the review of that book in Littell's Living Age for June 10, 1871; accounts that have been examined, audited, reported upon by the proper committee, and adopted, are *settled accounts*: Story's Equity Jurisprudence §§ 523–6; Adams' Equity 227; *Philips v. Belden* 2 Edw. Ch. 13; *Lockwood v. Thorne* 11 N. Y. 171; *Dows v. Durfee* 10 Barb. 213; *Wiggins v. Burkhum* 10 Wall. 129; and are not open to re-examination except on the ground of fraud or mistake: *Chappedlaine v. Dechenaux* 4 Cr. 306; after a body which can authorize expenditures has ratified them for a series of years and repaid them with interest, it cannot refuse to refuse to repay later expenditures on the ground that they had not authorized them: *Church v. Kidd* 3 Hun 269; *Lloyd v. Carrier* 2 Lans. 365; *Esterly v. Cole* 3 N. Y. 502; *Reid v. Rensselaer, etc. Glass Factory* 3 Cow. 393: 5 Cow. 587; *Carson v. Alexander* 34 Miss. 528; an agreement to pay ten per cent. interest may be implied from acts done though it is not expressly authorized except on agreement therefor in writing (Browne St. Fr. §§ 124, 346–7) as the purpose of the statute to prevent frauds is not thereby violated.

MARSTON, C. J. The original bill in this cause was filed for an accounting between defendants Douglas and Rose respecting moneys which had been received at the Chemical Laboratory of the University of Michigan, on account of the University, but not paid over or accounted for to the complainants, and for a decree against the defendants, or either of them, for such amount as should be found in their or his hands. The other defendants were joined as standing in the position of sureties for the defendant Rose, and responsible with him for any amount for which he should be found

chargeable. Answers were filed in the case by Douglas and Rose severally, each admitting the rights of complainants to an accounting, but each averring that the failure to account and pay over moneys received was chargeable to the other and not to himself. In the progress of the cause, a stipulation, which will be more fully referred to hereafter, was entered into by all parties, whereby it was agreed that there was a deficit in the accounting to the sum of $5671.87; that Douglas was liable for so much of this as had come to his hands and was not accounted for and paid over to the complainants, and Rose for so much as he had received and not accounted for and paid over to Douglas or to complainants; that an interlocutory decree for an accounting in open court should be entered in order to ascertain the respective liabilities of the parties; that this should not estop the complainants from calling on Douglas to account for any money received by him for complainants, otherwise than from Rose, but that after the accounting there should be a further accounting between complainants and Douglas as to any matters between them not involved in the accounting first to be taken. Under this stipulation the parties proceeded to take voluminous testimony in open court, and this was examined and reviewed by the circuit judge in the opinion rendered by him when disposing of the issue made on the original bill. In none of the testimony was it questioned that the moneys not accounted for to complainants had first been received by Rose, with the exception, perhaps, of a few small sums, but the controversy narrowed itself to this: Whether Rose had paid them over to Douglas, so that the responsibility for the deficiency was upon the latter, or whether, on the other hand, the deficiency was chargeable to Rose himself.

The summary of the facts by the circuit judge is so concise and accurate that I copy it here:

" The Laboratory is entrusted by the Regents to the supervision and general management of a director.

" This position was filled by Dr. Douglas from the establishment of the Laboratory to sometime in the spring of the present year. Chemicals and apparatus were purchased and

kept on hand for the use of students in the prosecution of their studies, and dispensed to them from time to time for that purpose, thus necessitating an account with each student. Dr. Rose entered the Laboratory April 3, 1866, as assistant, and was entrusted with the duty of keeping books of account with the students, and receiving money from them. At this time all agree that the system of Laboratory accounts was imperfect and unsatisfactory. There was a system of accounting between the director and the assistant. Money was received from the student by each indiscriminately. This method continued in use until the close of the fiscal or college year in June, 1866. The next fiscal year commenced in October, 1866. At this time some change and improvements in the system of accounts between the Laboratory and the students, and between the director and the assistant, was introduced at the suggestion of Dr. Rose, and with the concurrence of Dr. Douglas, which seems to have continued without any change during the period involved in this controversy. By this system, which is the former one modified and improved, a student applying for admission to the Laboratory makes a deposit to apply on chemicals, etc., to be supplied to him. This was required by the rules of the department, and was also practiced under the former system. The deposit required was $10, though sometimes in very exceptional cases it would be $5, $15 or $20. The money was paid directly to the assistant, for which he gave to the student a receipt, prepared or filled up from a book of blank vouchers with accompanying stubs, the entries upon the stubs indicating the number of the receipt, its date, the name of the student to whom issued and the amount of the deposit. Upon the back of the receipt was printed a blank certificate intended to be filled up with the full amount paid at the final settlement and signed by the student. These receipts, commonly called tickets, entitled the student holding them to a table for work in the Laboratory, when a vacancy occurred, in the order in which they were issued.

"If the student for want of a table, or for any other cause, did not enter upon a Laboratory course, the deposit money,

upon the return of the receipt, would be refunded to him by the assistant, and the receipt being returned to the director at the next succeeding settlement with him would be destroyed, and the corresponding stub marked 'cancelled' by a diagonal line upon it in black ink. If he did enter upon his course, an account was opened with him upon the Laboratory ledger, so called, in which he was credited with the amount of his deposit, and charged with all the chemicals supplied to him from time to time. If at any time the ledger indicated that the debtor side of the account was materially in excess of the credit side notice would sometimes be given to make a further deposit.

"If after entering upon the work the student should leave before the end of the course, whether before or after the deposit money was exhausted, his account was treated as forfeited, and so reported by the assistant to the director. This term 'forfeited accounts' seems to have been applied inaccurately to cases where the student left in debt to the Laboratory. Where an account is for any cause declared forfeited, all payments made subsequent to the first deposit are called subsequent payments on forfeited accounts. The payment need not have necessarily been made as I understand, after the report of the forfeiture. Upon the completion of a Laboratory course the accounts in the ordinary course of business would be settled, the balance either way paid, and the ledger balanced. The balance was, of course, quite uniformly—though not always—against the student, and it would be paid to the assistant, but in very exceptional cases the deposit would exceed the chemicals charged, and in that case the balance would be paid to the student. But, in any event, when an account was settled the deposit receipt, if possible, was produced by the student, the blank certificate on the back filled out with the full amount paid to the assistant, including the deposit, signed by the student and delivered to the assistant. Thus this voucher and the ledger would show the whole amount paid, and when paid. It often happened that the student had lost it, or for some reason, was unable to produce at the final settlement his

deposit ticket or receipt. In such cases, in the usual course of things, a duplicate would be made out and the student's certificate filled out and signed.

"Instances, however, are said to have occurred where accounts were settled and balanced upon the ledger, upon the student's promising to return the deposit ticket, with the certificate upon it, properly signed, without producing a duplicate voucher, but which he failed afterwards to do. This would give rise to a missing ticket, but it would be in the hands of the student and not be in the hands of either Dr. Rose or Dr. Douglas, a circumstance of possible consequence in explaining the absence of or loss of tickets.

"Douglas being the director, and Rose the assistant, money coming into the hands of the latter from the students, or otherwise, on account of the Laboratory, were from time to time paid over to the former, who reported annually to the Regents, usually in the month of June. It seems to have been the aim of the director and the assistant to settle and adjust their money affairs, growing out of the Laboratory, at least as far as practicable, about once a month, though sometimes a longer and sometimes a shorter period seems to have intervened according to the testimony of both. Upon the occasion of these periodical settlements, the method of accounting between them, so far as it can be serviceable to refer to it here, seems to have been this: The stub book of course would show the number of deposit receipts issued since the last preceding settlement, and the stubs the amount of money received from this source. Resort was therefore had to the stubs for the purpose of ascertaining the amount of deposit money received since the last settlement; and at the conclusion of the settlement, Douglas, to indicate that the [deposit] money had been passed over to him, would place his name or initials 'S. H. D.' or the single letter 'D.' upon each of the stubs since the last settlement, placing what is called a settlement mark—usually a cross or some other character—upon the last stub so initialled.

"The tickets or students' vouchers taken by the assistant since the last settlement, were produced to show the amount

received since that time, and the amount with which he should be charged on that account would be ascertained by adding the amounts upon the backs of the tickets and deducting the amount represented by the face, which would have been paid over at some former settlement. The tickets were then turned over to Dr. Douglas with the money, and to indicate the payment or to evidence the transaction, a red line was drawn diagonally across each stub, corresponding to the tickets turned over, and those vouchers, according to the regular course of business, would accompany the next annual report of the director to the Regents; thus the initial letter and the red line would receipt for all money received from the student and paid over to Douglas upon ledger accounts, which were represented by a stub and voucher. It often happened that the rule requiring an applicant for admission to deposit $10 was not adhered to; for various reasons students were allowed to enter without making a deposit, and in that case no deposit ticket or receipt would be issued. There would of course be no stub—hence the name 'stubless account.' However, upon the final settlement of this class of accounts, it seems to have been the habit of Dr. Rose, sometimes at least, to make up a deposit ticket and student's certificate as in other cases. In some instances this course was pursued, in others not; and when not, the account would become stubless after settlement, and in that case there would be of course no vouchers to hand over to Dr. Douglas and no stub to red line, indicating the payment of money to him. It may, however, be said here, that it is claimed on the part of Dr. Rose that this class of stubless accounts, and subsequent payments on forfeited accounts, were ascertained from the ledger and paid over at the last or final settlement in each year, which he styles an annual settlement.

"There are some material points of difference between Dr. Douglas and Dr. Rose respecting the course of business between them, especially in respect to the annual or last settlement of the year, which will be noticed hereafter. Enough has been said here to point out the different classes of delinquent accounts without misunderstanding. They are as follows:

*First*, missing tickets, which, according to the regular course of business, should have been returned by the student to Dr. Rose, by him to Dr. Douglas, and by the latter to the Regents, but which do not appear upon the reports of the latter to the Regents, and are not found with others in the steward's office, and upon the corresponding stubs of which are found the name of Douglas, or initials ' S. H. D.,' or the single letter 'D.' (an exceptional instance or two are found where the initials are wanting); *second*, missing tickets, with corresponding stubs red lined; *third*, stubless accounts, or accounts upon the ledger not represented by stub or voucher; *fourth*, forfeited accounts, or accounts for any cause reported as forfeited; and, *fifth*, subsequent payments on forfeited accounts.

"It will now be seen that if the names or initial letters upon the stubs, representing the delinquent deposit money, are genuine—if they were truly made by Dr. Douglas—they afford sufficient evidence that the money was paid by Dr. Rose to him, and it should in that case be charged to him in this accounting; if they are not genuine they do not afford such evidence, and the money should be charged to Dr. Rose. If the red lines upon the stubs representing delinquent accounts were made by Dr. Douglas, or Dr. Rose in his presence, or by his direction, then they afford satisfactory evidence that the money represented by them was paid to Douglas, and this class of delinquent money should be charged to him—otherwise to Rose. If the delinquent ledger accounts, not represented by stub or voucher, were settled for or paid over at the annual or final settlement, then they should be charged to Douglas—otherwise to Rose—as it is not claimed that they were paid except at the last or annual settlement in each year. Forfeited accounts are represented by stubs with initials indicating payment to Douglas. Subsequent payments on forfeited accounts were practically stubless accounts."

These were the main facts. In passing upon them the circuit judge reached the conclusion that the defendant Douglas was chargeable with some portion of the deficiency,

and the defendant Rose with another and larger portion. As regards the alleged forgery of the letter " D " or the initials " S. H. D." or the name "Douglas" on the stubs or vouchers, indicating that moneys had been paid over by Rose to Douglas, the judge was of opinion that the evidence did not justify the conclusion that the name and initials upon the stubs were otherwise than genuine, and all the stubs thus marked were left to stand as vouchers against Douglas. In other respects the conclusion of the circuit judge was favorable to Douglas, and his opinion, after reviewing in detail the evidence respecting the conduct of Rose when the delinquency was first discovered, concluded as follows : " On the whole, whatever doubt there would have been respecting the result, if the case were confined to evidence growing out of the books of account and the loose methods of accoun ing between Rose and Douglas, the subsequent talk and conduct of the former is every way so inconsistent with his present claim, except in respect to the questioned " D "s, and so confirmatory of the claim of Douglas respecting the stubless accounts and the red-lined stub accounts, that I cannot hesitate to say that the fair weight of evidence leads to the conclusion that stubless accounts were not paid over at the last or annual settlements, and that the red lines upon the stubs representing delinquent accounts, cannot be accepted as satisfactory evidence that the corresponding vouchers were turned over."

An interlocutory decree was thereupon entered referring the case to a commissioner to state the account with the following directions : *First*, that the delinquent deposit moneys, represented by stubs with initial letters or names, should be charged to Douglas; *second*, that delinquent accounts represented by red-lined stubs should be charged to Rose; *third*, that ledger accounts not represented by stubs or vouchers should be charged to Rose; *fourth*, that forfeited accounts represented by initialled stubs should be charged to Douglas, and subsequent payments on forfeited accounts, being practically stubless accounts, to Rose.

The accounting took place according to the directions of

the decree, and the result was that a decree was entered
February 15, 1878, which adjudged that the defendant
Douglas was liable for and should pay to complainants the
sum of $1716 03, and the defendant Rose was liable for, and
with his sureties should pay to complainants, the sum of
$4647.55.   It was also decreed that complainants should
recover their costs of the defendants, but questions respecting
them, and respecting costs between the defendants, were
reserved.

From this decree defendant Douglas took an appeal.   The
complainants moved to dismiss on the ground that the case
was not yet so far disposed of as to be appealable, and counsel
for the appellant practically conceding the point, the appeal
was dismissed.

On January 22d, 1878, defendant Douglas filed a cross-bill
for an accounting between himself and the Regents in respect
to other matters, and an issue was taken upon this and an
accounting had.   The matters embraced in this bill consisted
in a balance shown to be due to Douglas in his last account
rendered various errors which have been discovered in pre-
vious accounts, and interest on balances owing to him from
time to time for moneys advanced.   The Regents denied all
liability to pay interest, and they claimed to offset against
any amounts established in favor of Douglas all items of
interest previously charged against them by Douglas in his
accounts, and also a number of mistakes in his accounts which
were in his favor.   The accounting was had with the follow-
ing result: The circuit judge credited Douglas with the
amount of his final account and with such errors in other
accounts as were thought to be established, and which ope-
rated against him, amounting in all to $2846.45.   From this
were deducted the amount of the previous decree, certain
errors which had been discovered, which were in his favor,
and the interest items previously allowed to him, making in
all $2829.90, and leaving a balance due Douglas of $17.46, for
which a decree was entered in his favor.

It is by appeal from this decree that the case is now before
us.

The appellant Douglas claims that certain portions of this decree are erroneous, viz.: In crediting the Regents and charging him with the amount of $1716.03 "deficit deposit moneys" as determined by the decree of February 16, 1878, and interest thereon; in charging him and crediting the Regents with certain "so-called old accounts" amounting to $53.19 and interest thereon; in not allowing his claim for certain interest on certain advances made by him; and in disallowing his claim to be credited $390 for error in balance brought forward in his account rendered for 1870–1.

These questions I shall consider in the inverse order of the above statement.

Although there was no appearance in this court, except on behalf of the appellant, yet his counsel voluntarily furnished the Court, on the hearing, with printed copies of the briefs and argument of the principal counsel for the complainant Regents, and of the defendant Rose, and also of the opinion of the circuit judge upon the merits; and the Court was also furnished with a manuscript brief of counsel for the Regents, to all of which due and careful consideration has been given.

Taking up these several questions raised by the appeal, the first in order will be the one last above stated.

*First.* Appellant claims to be credited the sum of $390 for error in balance brought forward in his account rendered for 1870–1. I have carefully examined the evidence and the briefs referred to, in order to ascertain if a mistake had been made as claimed. The report made by defendant Douglas to the Regents for 1869–70 showed a balance in his hands belonging to the University of $61.49. The two last items of credits to the University upon this report are under date of June 29, 1870, viz.: June 29th, sundry persons, $836.22, and diplomas $19. His next report to the Regents credits the University, under date of July 1st, "By bal. $451.49." On turning to his book of accounts from which these reports were made I find the balance there stated under the same date $361.49; the other credit items correspond with his report. Turning back upon the same book to his account

for 1869 and up to June 29th, 1870, I find the total receipts footed up at $5685.87, and the expenditures at $5324.38; this makes the balance, as stated upon his books, $361.49. It is very clear, however, that a mistake was made in the footing-up of the receipts for 1869, as was pointed out during the argument by one of the members of the court. The correct footing-up is not $5685.87 but $5385.87, thus clearly showing a mistake of $300 to have been made in favor of the University. I have been unable to account for the difference between the amount or balance as shown upon his book and in his report. As already said, the book, as erroneously footed, showed a balance of $361.49, while his report gave the balance as $451.49; the mistake of $300 is clear, while there remains $90 unaccounted for. The evidence tends very strongly to show that this $90 was not received, yet the manner of keeping accounts was so loose and is so unsatisfactory that I am of opinion this $90 should be charged to the defendant Douglas. He having once reported the receipt thereof to the Regents, he must assume the burden of proving the mistake. This has been done to the amount of $300 and that amount should be credited to him.

*Secondly.* I now come to the question of interest. Defendant Douglas while director of the Laboratory, claiming to have made certain advances therefor, over and above the receipts therefrom in his hands, made monthly balances of his accounts and charged interest upon any balance found in his favor at the rate of ten per cent. per annum. In his annual accounts to the Regents the interest thus claimed and computed was charged. In some of the accounts this charge was more clearly and distinctly set forth than in others, it appearing in all as a charge of interest, but not in every instance showing how or upon what balance it was computed. The fact that such advances were made and that such balance in his favor in fact existed, is not disputed, except upon the theory of charging him with the entire receipts of the Laboratory. It was farther shown that there was no express authority given him by the Regents to make any advances, or if he did to charge interest thereon. These

accounts, when presented to the Board, were usually referred to the finance committee, by them examined, and reported back as being correct. There was no uniformity in the action taken by the Regents upon these reports; some were "accepted and the account and vouchers placed on file," others " accepted," " accepted and adopted," and " adopted." And this is true of all of the reports up to and including the report for 1871–2, except for the year 1866–7, which, although made and referred to the proper committee, the record of the Board fails to show any report made or action taken thereon. The report for that year is found on file, and formed the basis for the next year's report which was acted upon.

It has been claimed that the Regents, in auditing and allowing his accounts, did so in ignorance of the facts relating to the charges of interest, and that the Board had no authority to borrow money or to pay interest upon such advances. I do not deem it necessary to pass upon the question of the power of the Board of Regents to borrow money or to pay interest. I have no doubt but that where money has been paid out or expended for the use and benefit of the University, in cases where the Board could have expressly authorized such expenditures, they may ratify the act and direct payment thereof with interest at any rate not exceeding ten per cent. per annum; and where the Board with full knowledge of the facts has made such payment, such action will be final and cannot afterwards be disturbed.

Did then the Board of Regents pass upon these accounts with full knowledge of the facts? Whether as a matter of fact each member of the Board carefully examined these accounts for the purpose of ascertaining what was charged therein, and the reason therefor, is not of very much importance in the present inquiry. I shall not, therefore, consider the evidence tending to show such to have been the fact. In the presentation of these accounts, and the charges of interest therein, no fraud or concealment was attempted. The accounts upon their face showed certain interest items charged against the University. This was sufficient to put

the Regents upon inquiry, and in case they did not fully understand the charge as made, or the reason for making it, it became their duty, before acting farther thereon, to make full investigation and ascertain all the facts relating thereto. No one can doubt for a moment but that a proper investigation would have given them all the facts and circumstances pertaining to this question of interest. Such being the duty of the Board of Regents, this court cannot presume that it was either neglected or carelessly performed by that body. In the absence of fraud it must be conclusively presumed that the Board did know the facts relating to these charges and allowed them in the light thereof. What was said in *Detroit Advertiser etc., v. City of Detroit* 43 Mich. 116 is equally applicable in this connection and need not here be repeated, and the rule there laid down must be held decisive in the present case upon this question, so far as interest was allowed, which includes the amount in the report for 1871-2 and previous years.

The records of the Board do not show final action upon any report subsequent to that of 1871-2, consequently no allowance of interest thereafter. And I am of opinion, therefore, that interest after that time cannot be allowed in this case. If it could, clearly, under our statute, the rate could not exceed seven per cent. in the absence of a written agreement. Where charged and paid in the absence of such an agreement the person receiving such rate may retain it, but he cannot make that the basis for the recovery of the same rate upon implied contract. I am also of opinion that no implied contract can thus grow up under which interest can be recovered; that the rule applicable between individuals cannot here be followed, but rather the rule applicable between the State or municipalities and individuals must here govern. I have heretofore had occasion to examine the question whether interest could be claimed from the State upon an implied contract, and came to the conclusion that such was not the general rule, and I have seen no occasion to depart from or change the conclusion then arrived at. Report of Auditor General for 1874, ccxlv.

I am of opinion, therefore, that the interest charged in the report for 1872–3 and subsequently, cannot be allowed the defendant.

*Thirdly*. Old accounts amounting to $53 19. Before attempting to pass upon this and the remaining claim, it might be well to first ascertain the relations existing between the defendant Douglas and the University, and his legal liability to the University resulting therefrom.

As I have already given a full statement of the facts, a brief reference at this point will be sufficient. Defendant Douglas was at an early day appointed assistant professor and afterwards professor of chemistry. As such it was a part of his duty to purchase chemicals for the Laboratory, furnish them to students therein as necessary, collect the price thereof and account therefor to the Board of Regents. Our attention has not been called to, and I have been unable to find, the record of his appointment or the authority then or afterwards expressly conferred upon him. Evidence has been introduced as to what some members of the Board considered his duty, viz., to superintend the business of the Chemical Laboratory, receive and account for all moneys coming into the same; to act as its director, and to report to the Board the result of the management thereof, including all moneys coming into his hands, and all moneys paid out by him in connection therewith. As early as 1864 assistants were appointed, who, amongst other duties, took charge of the books, dispensed chemicals to the students, kept their accounts, collected from them and paid the same over to defendant Douglas.

· In June, 1865, defendant Douglas made a report to the Regents in which the following appeared: ` *The Dispensing of Chemicals and Apparatus and the Keeping of Accounts in the Laboratory.* An account is kept with each student in the Laboratory, who is made to pay for what he actually consumes; the labor attached to this branch is very great and requires the services of a good and correct accountant; thus, in transacting the business of the past year, there have been made in the books of the Laboratory upwards of :

1800 entries of charges and credits, and in the hands of a careless and inefficient man large amounts may be lost to the University. Under all these circumstances I respectfully suggest to your honorable Board the appointment of an assistant of chemistry and lecturer on organic chemistry and metallurgy, at a salary of $1000, and that the remaining two assistants now authorized to be employed be paid, respectively $250 and $300; the expenses of the Laboratory would be thus increased $800; with this sum I think the services of one permanent and efficient assistant can be secured, and if the waste and loss consequent upon irresponsible and inefficient help is taken into account, it will prove little if any more expensive than the present arrangement." At the same session the committee to whom was referred the above reported the following, which was adopted: "*Resolved*, That an assistant professor of chemistry and lecturer on organic chemistry and metallurgy, at a salary of $1000, be employed, and that the remaining two assistants, now authorized to be employed, be paid respectively $250 and $300 per annum." The following was also adopted: "On motion of Regent Knight the appointment of an assistant professor in the Laboratory was referred to the executive committee and Professor Douglas." Under this authority Dr. Lewis was appointed to take charge of the books, dispense chemicals and keep accounts, and he held such position until the spring of 1866, when he resigned, and Dr. Preston B. Rose was then appointed.

I do not understand it to be claimed, or that, as a matter of fact, defendant Douglas, during or after 1864, kept the books of account with the students or dispensed any of the chemicals, or, with a very few exceptions, collected any moneys from the students. The books were kept, and all this work was done, by an assistant who accounted to defendant Douglas.

Under such a state of facts it is important to first determine whether defendant Douglas can be properly charged with and held liable for all moneys, which the books show to have been paid, or which were actually paid, to such assist-

ants, or only for the amount by them paid over to him. I have been unable to discover any principle or decision under which defendant Douglas can in this case be held liable for moneys not actually received by him. No such enlarged responsibility can result from his office or the class of duties he performed. The keeping of accounts and collection of moneys from the students could not, from the very nature of his position and the duties he had to perform, primarily fall upon him. He was not a mere accountant and collector. That duty necessarily must have been and was in fact entrusted to others—assistants who were appointed under authority from the Board of Regents, their salary fixed by them, and paid out of University funds. I make no distinction on this account, for there is none, because they may have been paid from Laboratory moneys and by the director; they were none the less University funds which otherwise it would have received. These assistants were not therefore the clerks, servants or agents of the defendant Douglas, for whose acts he would be chargeable, and the mere fact that he had power to employ or discharge them, would not make them such. They were in the employ of the University and were subject to be called to account by, and were responsible to, the Board of Regents for their acts and conduct.

If it was a part of the duties of the defendant Douglas to keep strict watch and account of their doings to prevent loss to the University, and he was guilty of such negligence in this respect as would render him responsible for the losses sustained in consequence thereof, the question might be different, but such is not the theory of the bill in this case.

It is not necessary, however, to rest the case upon this ground alone; as already intimated, the bill of complaint does not seek to charge him with any but the moneys that came into his hands. Farther than this, after the cause had been at issue, counsel representing all the parties, complainants and defendants, entered into a written stipulation, in which I find the following: "*1st.* All the said defendants who have appeared, consent and agree that said Douglas is liable to account to and pay over to said complainants so

much of the Laboratory deficit, so called, as came into his hands, and which has not been accounted for by him to the Regents, if any; and also, that said Rose is liable to account to, and pay over to, said complainants so much of said deficit as came into his hands and which he has not accounted for to said Douglas or to said Regents, if any.    *    *    *    *    *
*4th.* Nothing contained in the record of this cause, or the decree to be made therein, shall, at any time hereafter, be alleged or held to estop the complainants from calling on said defendant Douglas to account to them for any money which he may have received for their use, other than such as was received by him from or through said defendant Rose."

The authority to enter into this stipulation has not been and could not well be questioned, and it clearly fixes the liability of each to such amount "as came into his hands and which has not been accounted for by him." Whether therefore we look to the bill of complaint, the stipulation, or the legal liability resulting from undisputed facts, we can only charge defendant Douglas with the moneys received by him and not accounted for. It also follows from such a state of facts that there must be evidence, at least, tending to show moneys into Douglas' hands in order to justify the rendition of a decree against him. In stating this I do not overlook the second clause of the stipulation referred to which fixed the amount of the deficit, but left open the question what amount thereof should be charged to Rose and what amount to Douglas. This matter of division or apportionment was left to be settled by the court in the usual manner upon relevant and competent testimony in the case. It is not sufficient, therefore, in order to charge defendant Douglas, to show by the books kept by an assistant that a certain amount of money had been paid to the assistant, or, as a fact independent of the books, that such sums were paid to the assistant, as such evidence has no tendency to show that Douglas received it. Proof of these facts would necessarily be one of the steps in the case, but standing alone would fall short of establishing a liability against Douglas, or call upon him to account for what he has not been shown to have received.

The burthen of proof, in reference to these old accounts, is upon the complainants; and in reference to the deficit fixed by the stipulation, is upon defendant Rose, to show the money in Douglas' hands in order to charge him therewith. In seeking to establish such fact the rules applicable to the proof of facts in civil cases must be observed, and the fact may be shown by any competent testimony fairly tending, either alone or in connection with other circumstances, to establish it.

I have been wholly unable to find any satisfactory evidence that defendant Douglas received any of these old accounts charged to him in the decree. They are very old matters, running from 1860-1 to 1863-4, and the books kept at that time are principally relied upon to charge him. These books are not in his handwriting; the evidence shows that they were very carelessly kept; that the tickets then in use were relied upon in the settlement with the students, and that corrections made in the settlement did not necessarily appear upon the books, and that the entries therein are not correct. Under such circumstances I am of opinion that these old accounts should not be charged against the defendant Douglas. It may be very questionable whether the books, kept in such a manner, could be admitted in evidence as against this defendant, but as the proof stands, the question is hardly of sufficient importance to justify an extended discussion.

*Fourth.* I now come to perhaps the most difficult, certainly the most important, question raised by the appeal. The decree charges the defendant Douglas with certain deficit deposit moneys, paid in 1866-7 and following years up to 1873-4, amounting to $1275 and interest thereon. What has been said under the last subdivision, relating to the old accounts, as to the relation of the several parties, their respective liabilities and the burthen of proof, is equally applicable here and need not be repeated.

The principal evidence relied upon to charge defendant Douglas with the receipt of this deposit money is the stubs remaining in certain books, with the name, or initials, or initial D. thereon, of Douglas as a receipt or voucher that he

had received the amount mentioned in such stub. It is not disputed, but it is in fact conceded, that if all the vouchers for deposit money on the stub-books are genuine, the decree in this respect is correct and should not be changed. Defendant Douglas testified that the vouchers on stubs 37 and 44 to 85, inclusive, in stub-book 2, are not in his handwriting, and although testifying that there were others which he believed were not, these were the only stubs specifically pointed out by him. This, in my opinion, puts these stubs in issue, as would an affidavit denying the execution of an instrument sued upon. Twelve stub-books, running from 1866 to 1876, were put in evidence. On nearly all the stubs in these books I find defendant's vouchers, the great bulk of which are unquestioned. I do not, in this connection, refer to the red-line vouchers. Nearly one hundred orders drawn by the recorder upon the treasurer of the city of Ann Arbor, and countersigned by defendant Douglas as mayor, were put in evidence by the defendant Rose. There is also a large number of books and papers in evidence, containing the genuine handwriting of both the defendants Douglas and Rose.

I have made most careful examination and comparison of the writing and signatures of defendant Douglas with the disputed vouchers. I have also made a quite careful examination of defendant Rose's handwriting and signatures with the disputed vouchers. This last, however, was not as careful as the first for two reasons: *First*, if these disputed vouchers were the work of Rose, I would not expect them to be in his ordinary and natural handwriting but rather as an imitation of Douglas; and *secondly*, if I became satisfied they were not made by defendant Douglas, it would not, for the purpose of this case, become necessary to find by whom made, inasmuch as the case would then be merely this, that defendant Rose had received certain moneys for the payment over of which he had failed to produce vouchers. If I had confined my examination to defendant Douglas' signature on the city orders referred to, and a comparison thereof with the disputed vouchers, I should have no hesitation whatever in saying that the latter were not genuine. The city

orders, however, were all countersigned in 1871–'2 and '3— most of them in 1872—while these disputed stubs are dated September, 1867.   An examination of the previous stubs in the same book, number 2, running from December, 1866, to the date of the disputed stubs, and of stub-book number 1, running from August 9, 1866, to December 10th of the same year, would not tend to weaken but strengthen such opinion. Thus far there can scarcely be said to be any resemblance whatever between the disputed papers and those shown or admitted to be genuine.   No doubt, if all these I have mentioned, numbering about four hundred, should be taken and compared, resemblances might be pointed out between some which are disputed and some conceded to be genuine, but some resemblance would be expected on any theory of the case.

I encounter more difficulty when I come to the examination of other stub-books, for there is unquestionable evidence in the signatures and initials not disputed, that the handwriting of defendant Douglas underwent some changes in the period covered by them, which introduces an element of considerable embarrassment in the attempt to test these disputed papers.

In addition to the examination thus made we have the expert testimony, which cannot be overlooked but must receive such weight as in our judgment it is fairly entitled to. I may not be able to agree with the witness to the full extent of his theories, as in saying that certain initials or signatures were not and could not have been made by defendant Douglas, and yet there may be many things in his testimony that will aid us in arriving at a correct conclusion.   Evidence as to the genuineness of handwriting given by a witness possessing the requisite experience and skill is admissible, and being so, must be considered, and given, in the light of all the evidence bearing thereon, just such weight as the court or jury may deem it reasonably entitled to.   It cannot be rejected *in toto*, simply because expert testimony, in passing, unheeded, the actions of the respective parties.   I do not now refer to opinions of witnesses based upon mere appearances, when parties are questioned touching matters of this

character; but to such acts, conduct and utterances as evidently were made deliberately and understandingly. Such acts and declarations have ever been considered competent evidence in civil cases, and are entitled to be weighed and considered in the light of the circumstances under which they were made.

Defendant Rose, when his attention was first called to the fact that the account submitted by him or return made to defendant Douglas was not complete, examined his books and admitted that the names submitted to him were not included; others were presented and like acknowledgments made. He then voluntarily offered to, and did, prepare a list of delinquent accounts for 1874–5, entered it in defendant Douglas' "long-book," and certified to its correctness; said he knew no better way than to find out how many were deficient, and pay them, and did borrow the money and paid them. Afterwards a deficit for previous years was discovered, and on his attention being called thereto, while denying that he was aware of any such deficit, yet he gave security to meet whatever might be found. A list of delinquent accounts for 1873–4 was made out, amounting to over eight hundred dollars, and on the 13th of November, 1875, he certified thereon that, so far as he knew, it was correct according to the examination of the books. He afterwards, on December 7, asked leave to make a supplementary statement thereto on the same paper, which not being permitted, a separate statement was made by him, but which does not explicitly question the correctness of his previous certificate. His admissions to President Angell and others all bear directly upon this question.

Much has been said, in the briefs of counsel referred to, as to the unfairness of the means resorted to for the purpose of procuring these admissions, papers and securities. I cannot agree with counsel in what they have said upon this subject. I certainly have heretofore gone as far as any court has in denouncing attempts to encourage men to commit crime in order to detect and punish them therefor, because of their previous supposed criminal conduct, and I have

no desire to depart from what I then said: *Saunders v. People* 38 Mich. 221. But in this matter, in all that was done no effort was made to have defendant Rose commit any wrong, but simply to acknowledge that he had omitted to make proper returns. This is a very common practice, and I certainly see no objections that can be urged against such a course, unless undue means are resorted to, which I think were not in this case, and I fully concur with the learned circuit judge in what he said in speaking of the trust deed given to secure the Regents against loss on account of delinquencies in former years: "Douglas was not present upon this occasion or connected with the transaction, and there certainly was nothing oppressive or over exacting in the conduct of the two Regents with whom the business was done, or that should excite timidity on the part of Rose." But perhaps the very strongest reasons that can be shown against the charge of undue influence to procure such written admission is the fact that the commissioner, in stating the account, found, and the court below approved his finding, that the list of delinquent accounts for 1874–5, entered and certified upon the "long-book" by Rose as correct, and the delinquent list for 1873–4, as certified to by him on November 13, 1875, already referred to, were in substance correct, and charged him therewith, and with the decree thus rendered he had rested satisfied, having taken no steps to obtain a review thereof.

I have given due consideration to the argument found in the briefs against these things, yet in view of the evidence of the men to whom these statements were made, I cannot come to the conclusion that any undue or improper advantage was sought or taken of defendant Rose, or that the circumstances would justify me in not giving due weight to such testimony. There was no illegal compulsion used, nor was he imposed upon or under duress. Nor have I overlooked the argument that the first D vouchers are denied, and also what is said in reference to the spelling of the word *Dougles* or *Dougled* on stub number 44. Whether this word was so spelled intentionally to furnish an argument against

the probability of one familiar with a name thus misspelling it under such circumstances, I pass, but in my opinion this name was not written by defendant Douglas. Nor have I overlooked the offers that were made by defendant Rose asking for investigation. Much may be said in favor of the apparent fairness of some of these propositions, and I have no desire to criticise them ; they cannot overthrow or destroy the effect of the evidence in the case, and they can take but very little from its force and effect. There are still other facts and circumstances which might be considered and discussed at considerable length, yet it is deemed unnecessary in the present case.

In view of all the evidence I am of opinion it does not satisfactorily appear that the vouchers in stub book number 2 referred to were written by defendant Douglas, and he should not therefore be charged with the amounts represented thereby.

This still leaves a large number of delinquent deposit accounts charged to defendant Douglas. I have examined and considered with care the argument advanced by his counsel against the allowance of any of these accounts, and acknowledge its force. Bearing in mind, however, the admitted fact that for all genuine deposit stub vouchers unaccounted for he is responsible, and in view of the farther fact that although called as a witness and thus having full opportunity to point out all such vouchers as he did not believe were genuine, yet he did not deny any others except inferentially. If he had been incapacitated or disqualified as a witness, then no such denial could have been obtained, and the court must, from the other evidence in the case, have passed upon the question. But when a party is living, has been called as a witness, and does not specifically point out and designate those which he claims to be spurious, the court is quite justified in refusing to pay much heed to any elaborate argument by which it is sought to establish their falsity. In the absence of such a denial specifically pointing out those considered not valid, where, as in the present case, the great

bulk of them are not questioned, all must be considered *prima facie* valid.

For these reasons I am of opinion that all such delinquent deposit moneys must be charged to the defendant Douglas and that as to these the decree will not be disturbed.

I have thus carefully considered all of appellant's objections to the decree of the court below, except a question of costs. The appellant also insisted that the appeal brought up the whole case for review, and it was argued accordingly. Neither the Regents nor Rose or his sureties appealed, and neither of them appeared by counsel or otherwise in this court. This has been a source of great embarrassment to the court and has greatly increased our labor; and under such circumstances I think we have a right to assume that all parties, except Douglas, are satisfied with the decree as it stands. It is a long and well-settled rule that a decree appealed from by one party only, cannot be changed in the appellate court in favor of the party not appealing; and, as this rule is so well known and understood, it is expected that all parties will appeal who are dissatisfied with the conclusion of the circuit court, and desire to have the decree changed in their favor. The fact of dissatisfaction courts can only know by an appeal regularly taken according to the rules and practice of the court. Nevertheless, as we held in *Grant v. Merchants' etc. Bank* 35 Mich. 515, if in a case of accounting we find occasion to change the decree by allowing in favor of the appellant any items which were rejected in the court below, we will offset to these any other items claimed by the party not appealing which in our opinion were improperly rejected. But when a party acquiesces in the disallowance of any of his claims, and in this court neither by appeal nor otherwise complains of the disallowance, I think we have a right to assume that he is satisfied with the action upon it, and that he does not expect or desire us to examine into it. There may be reasons for his not desiring it which we could not know without their being explained to us, and it would be presumptuous on our part to treat the case in such a way, or to force the re-opening of matters which the parties con-

cerned chose to leave where they were left in the court below. We can give the appellant relief in so far as the decree may be found to err against him; but where no one else complains or appears, I shall follow the usual custom of courts and refuse to discuss such questions as in the case before us are mere abstractions, since the only possible motive in the discussion would be to express opinions on those parts of the decree below of which no one makes complaint.

The Court will assume, however, that any claim which is made by the appellant in this court, is in issue, and will look through all the evidence for any possible information which will show or tend to show that he is or is not entitled to have it allowed in his favor.

I am of opinion that the decree below should be modified in accordance with this opinion, and that appellant should recover costs in this court.

My brethren concurring, it is so ordered, and a decree will be entered in this court accordingly.

GRAVES, J., concurred.

COOLEY, J., concurring. In these cases it has seemed proper to me, in view of facts with which the public is familiar, that I should leave the examination of the record and the questions involved to be made by my associates without my presence or assistance. They have made their examination accordingly, and the result is embodied in the opinion of the Chief Justice just filed. I have examined that opinion and compared it with the record without finding occasion to disagree.

CAMPBELL, J., being disqualified by relationship to appellants' bail, did not sit in this case.